## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **NATHANIEL CULVERSON** | **CIVIL ACTION** |
| **VERSUS** | **NO.   17-7759** |
| **STATE OF LOUISIANA** | **SECTION:   "A"(5)** |

## <u>REPORT AND RECOMMENDATION</u>

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.    Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.    *See* 28 U.S.C. § 2254(e)(2). For the following reasons, **IT IS RECOMMENDED** that the petition for *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

### Procedural History

Petitioner, Nathaniel Culverson, is a convicted inmate currently incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.    On August 13, 1998, Culverson and co-defendants Samuel Kelly and Houston Jackson were charged by bill of indictment with second-degree murder in violation of La. Rev. Stat. § 14:30.1 and armed robbery in violation of La Rev. Stat. §§ 14:26 and 14:64.[1]    On November 7, 1998, a jury found Culverson and his

---

[1] State Rec., Vol. 8 of 20, Bill of Indictment, 8/13/98.    Culverson was charged with robbing a Chili's restaurant in Kenner, Louisiana, and shooting and killing the restaurant's manager, Jennifer Lutrell.

two co-defendants guilty as charged.[2]    On December 2, 1998, Culverson was sentenced to life imprisonment as to count one and 10 years as to count two, both sentences to be served consecutively and at hard labor without the benefit of parole, probation, or suspension of sentence.[3]    The State filed a multiple bill as to count two.[4]    On March 3, 1999, following a multiple-offender adjudication, the trial court vacated the original sentence as to count two and sentenced Culverson as a third-felony offender to 60 years imprisonment at hard labor without benefit of probation, parole, or suspension.[5]

On direct appeal, Culverson asserted that the evidence was insufficient to support the convictions for second-degree murder and conspiracy to commit armed robbery; that the trial judge erred in admitting into evidence prior inconsistent statements of two witnesses and the red book kept by managers of Chili's restaurant; and that his sentence was excessive.[6]    On March 15, 2001, the Louisiana Fifth Circuit Court of Appeal affirmed his conviction and sentence but remanded the case to the trial court to give written notice of the two-year period to seek post-conviction relief.[7]

---

[2]    State Rec., Vol. 8 of 20, Minute Entry, 10/28/98; Minute Entry, 11/2/98 Minute Entry, 11/3/98; Minute Entry, 11/4/98; Minute Entry, 11/5/98; Minute Entry, 11/6/98; Minute Entry, 11/7/98; State Rec., Vol. 2 of 20, Trial Transcript, 10/28/98; Trial Transcript, 11/2/98; State Rec., Vol. 3 of 20, Trial Transcript (cont'), 11/2/98; Trial Transcript, 11/3/98; State Rec., Vol. 4 of 20, Trial Transcript (con't), 11/3/98; Trial Transcript, 11/4/98; Trial Transcript, 11/5/98; State Rec., Vol. 5 of 20, Trial Transcript (con't), 11/5/98; Trial Transcript, 11/6/98; State Rec., Vol. 6 of 7, Trial Transcript (con't), 11/6/98; Trial Transcript, 11/7/98; State Rec., Vol. 7 of 20, Trial Transcript (con't), 11/7/98; State Rec., Vol. 1 of 20, Verdicts, 11/7/98.

[3]    State Rec., Vol. 1 of 20, Minute Entry and Commitment, 12/2/98; State Rec., Vol. 7 of 20, Sentencing Transcript, 12/2/98.

[4]    State Rec., Vol. 1 of 20, Multiple Bill, 12/2/98.

[5]    State Rec., Vol. 1 of 20, Minute Entry, 3/3/99; Commitment, 3/3/99; State Rec., Vol. 7 of 20, Transcript, 3/3/99.

[6]    State Rec., Vol. 7 of 20, Appeal Brief, 00-KA-22, 4/17/00.

[7]    *State v. Jackson*, Nos. 00-KA-221 to 00-KA-223 (La. App. 4 Cir. 3/15/01), 783 So. 2d 482; State Rec.,

Culverson filed a writ application with the Louisiana Supreme Court.[8]    On May 9, 2003, the Louisiana Supreme Court denied his application for a writ of certiorari.[9]    His conviction and sentence became final on August 7, 2003, when the 90-day period for seeking a writ of certiorari from the United States Supreme Court expired and he failed to apply for relief.    *See* U.S. Sup. Ct. R. 13(1); *see also Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999); *Roberts v. Cockrell*, 319 F.3d 690, 693 (5th Cir. 2003).

On October 18, 2004, Culverson filed a pleading entitled "Writ of Mandamus" with the state district court seeking production records included in the District Attorney file.[10]    On November 10, 2004, the state district court denied relief, and instructed Culverson to contact the District Attorney's Office in order to purchase the documents he was seeking.[11]    On December 21, 2004, the Fifth Circuit received Culverson's writ application seeking review of the November 10, 2004 order.[12]    On December 23, 2004, Fifth Circuit denied relief, finding no error in the district court's ruling.[13]    On January 21, 2005, Culverson filed a writ application with the Louisiana Supreme Court.[14]    The Louisiana Supreme Court found that

---

Vol. 7 of 20.    The appeals of the petitioner's two co-defendants were combined with petitioner's appeal.

[8]   State Rec., Vol. 20 of 20, Writ Application, 01 KO 1258, 4/30/01 (dated 4/10/01).

[9]   *State v. Culverson,* No. 2001-KO-1258 (La. 5/9/03), 843 So. 2d 386 (Mem.); State Rec. Vol. 20 of 20.

[10]   State Rec., Vol. 12 of 20, Writ of Mandamus, 11/3/04 (dated 10/18/04).

[11]   State Rec., Vol. 12 of 20, Order, 11/10/04.

[12]   State Rec., Vol. 19 of 20, Supervisory Writ of Mandamus, 04-KH-1451, 12/21/04 (postmarked 12/17/04).

[13]   State Rec., Vol. 19 of 20, *State ex rel. Culverson v. State*, 04-1451 (La. App. 5 Cir. 12/23/04) (unpublished writ ruling).

[14]   State Rec., Vol. 20 of 20, Writ of Certiorari, 05 KH 556, 3/7/05 (metered 1/21/05).

Culverson first had to make his request to the records custodian and denied relief on January 9, 2006.[15]

In the interim, on December 22, 2004, Culverson filed with the state district court the same "Supervisory Writ of Mandamus" he filed with the Fifth Circuit.[16]    On January 4, 2005, the state district court denied Culverson's request for relief as repetitive.[17]

On February 23, 2005, Culverson filed an application for post-conviction relief with the state district court.[18]    In that application, he asserted the following five assignments of error: (1) ineffective assistance of counsel for failing to request a mistrial; (2) the trial court erred in failing to exclude unreliable opinion evidence; (3) the trial court erred in allowing perjured testimony from Derrick Dunbar; (4) improper jury instructions on second degree murder; and (5) ineffective assistance of counsel for failing to file a motion to quash.    On March 31, 2005, the district court denied claims one, two, and three but ordered the State to file a response to claims four and five.[19]    On May 11, 2005, the State filed a response to petitioner's claims four and five.[20]    The court's ruling as it relates to claims four and five is not included in the record.    The record does not reflect whether Culverson sought writs

---

[15]  *State ex rel. Culverson v. State*, 05-556 (La. 1/9/06), 918 So. 2d 1034; State Rec., Vol. 20 of 20.

[16]  State Rec., Vol. 12 of 20, Supervisory Writ of Mandamus, 12/22/04.

[17]  State Rec., Vol. 12 of 20, Order, 1/4/05.

[18]  State Rec., Vol. 14 of 20, Uniform Application for Post-Conviction Relief and Memorandum in Support of Petition.    Federal *habeas* courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." *Causey v. Cain*, 450 F.3d 601, 607 (5th Cir. 2006).    The post-conviction application made a part of the state record was signed and dated February 23, 2005.

[19]  State Rec. Vol. 14 of 20, State District Court's Order on Petitioner's application for post-conviction relief, 3/31/05.

[20]  State Rec., Vol. 16 of 20, State's Opposition to Application for Post-Conviction Relief, 5/11/05.

from the Fifth Circuit and the Louisiana Supreme Court.

On March 5, 2014, Culverson wrote a letter to the "Judge of Division 'D' ", in which he informed the court that he had filed disciplinary complaints with the Louisiana Disciplinary Counsel against his trial and appellate counsel.[21]    In his letter, Culverson claimed that his counsel denied him effective assistance for failing to move to for a change of venue and to sever his trial from that of his co-defendants.    He further claimed his trial counsel rendered him ineffective assistance in his cross-examination of Derek Dunbar and Travis Robinson. He also claimed that Dunbar and Robinson signed affidavits in 2006 recanting their statements against him, although he did not attach the affidavits to his letter.    On May 14, 2014, the state district court construed the letter as an application for post-conviction relief and found it procedurally barred as untimely pursuant to La. Code Crim. P. art. 930.8.[22]

By letter dated June 11, 2015, Culverson requested copies of certain documents from the state district court.[23]   On June 25, 2015, the Clerk's Office responded to petitioner request for copies.[24]

On July 7, 2015, Culverson filed another application for post-conviction relief claiming newly discovered evidence consisting of an affidavit executed by Dunbar on November 26, 2014, in which he states that the prosecution coerced him into making false statements against Culverson related to a gun and a map of the Chili's.[25]    On July 15, 2015, the state

---

[21]   State Rec., Vol. 8 of 20, Letter, 3/10/14 (dated 3/5/14).

[22]   State Rec., Vol. 9 of 20, Order, 5/1/14.

[23]   State Rec., Vol. 9 of 20, Letter, 6/25/15 (dated 6/11/15).

[24]   State Rec., Vol. 9 of 20, Response to Request for Information and/or Documents, 6/25/15.

[25]   State Rec., Vol. 9 of 20, Application for Post-Conviction Relief, 7/13/15 (signed 7/7/15).

district court ordered the State to file a response to Culverson's application.[26]    On July 22, 2015, Culverson filed an amended application for post-conviction relief.[27]    On July 29, 2015, the State filed a response to petitioner's application.[28]    On August 12, 2015, Culverson filed a reply brief.[29]    On August 31, 2015, the state district court found that the affidavit was not credible and did not relate to Dunbar's trial testimony as it was Robinson, not Dunbar, who testified about a gun and a map.    The Court denied the petitioner's application for post-conviction relief.[30]    After Culverson filed a notice of his intent to seek a writ of review, the state district court set a return date of November 15, 2015, by which to file a timely application in the court of appeal.[31]

On September 30, 2015, the petitioner filed a timely writ application with the Louisiana Fifth Circuit Court of Appeal.[32]    On November 13, 2015, the Fifth Circuit found Culverson's application for post-conviction relief timely but denied relief, finding no error in the district court's ruling.[33]

---

[26]  State Rec., Vol. 9 of 20, Order, 7/20/15.

[27]  State Rec., Vol. 9 of 20, Uniform Application for Post-Conviction Relief, 7/27/15 (certified 7/22/15).

[28]  State Rec., Vol. 9 of 20, State's Response to Nathaniel Culverson's Application for Post-Conviction Relief, 7/29/15.

[29]  State Rec., Vol. 10 of 20, Reply to State's Response to Petitioner's Application for Post-Conviction Relief, 8/18/15 (signed 8/12/15).

[30]  State Rec., Vol. 10 of 20, State District Court Order denying Culverson's Application for Post-Conviction Relief, 8/31/15

[31]  State Rec., Vol. 10 of 20, Notice of Intent to Seek Writ of Review and Request for Return Date, 9/28/15 (dated 9/23/15); Order, 10/1/15.

[32]  State Rec., Vol. 19 of 20, 5th Circuit Writ Application, 15-KH-636, 9/30/15.

[33]  State Rec., Vol. 19 of 20, *State v. Culverson*, 15-636 (La. App. 5 Cir. 11/13/15) (unpublished).

On December 15, 2015, Culverson filed a writ application with the Louisiana Supreme Court.[34]    The Louisiana Supreme Court found Culverson's application was not timely filed in the district court and denied relief on April 24, 2017, citing La. Code Crim. P. art. 930.8 and *State ex rel Glover v. State*, 93-2330 (La. 9/5/95), 660 So. 2d 1189.[35]

On August 25, 2016, Culverson sent a letter to the state district court seeking copies of records pertaining to the jury selection in his case.[36]    The clerk of court responded to Culverson's request on September 7, 2016.[37]

On August 10, 2017, Culverson filed the instant application for *habeas corpus* relief.[38] In that application, Culverson claims prosecutorial misconduct in that the prosecution threatened Derrick Dunbar and coerced him to falsely testify and withheld crucial impeachment testimony in violation of *Brady.*

The State argues that the application should be dismissed as untimely.    It alternatively contends that Culverson procedurally defaulted his claim.[39]

## Analysis

I.    *Statute of Limitations*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 et seq., governs the filing date for this action because Culverson filed his *habeas*

---

[34]  State Rec., Vol. 20 of 20, La. Supreme Court Writ Application, 15-KH-2343, 12/15/15.

[35]  State Rec., Vol. 20 of 20, *State ex rel. Culverson v. State*, 15–2343 (La. 4/24/17), 217 So. 3d 341.

[36]  State Rec., Vol. 10 of 20, Letter, 9/6/16 (dated 8/25/16).

[37]  State Rec., Vol. 10 of 20, Chief Deputy Letter, 9/7/16.

[38]  Rec. Doc. 3, Petition under 28 U.S.C. § 2254 for Writ of *Habeas Corpus*, received by Legal Department August 10, 2017.

[39]  Rec. Doc. 15.

petition after the AEDPA's effective date.    *Lindh v. Murphy*, 521 U.S. 320, 117 S. Ct. 2059, 138 L.Ed.2d 481 (1997).    Title 28 U.S.C. § 2244(d) provides:

> (1) A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
>
> A. the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> B. the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> C. the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> D. the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Typically, a petitioner must bring his Section 2254 claims within one year of the date on which his underlying criminal judgment becomes "final."    With regard to finality, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."    28 U.S.C. § 2244(d)(1)(A).    When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court.    *Roberts v. Cockrell*, 319 F.3d 690, 693 (5th Cir. 2003).    However, "[i]f the defendant stops the appeal process before that point," ... "the conviction becomes final when the time for seeking further direct review in the state court expires."    *Id.* at 694; *see also Foreman v. Dretke*, 383 F.3d 336, 338 (5th Cir. 2004) (Section 2244(d)(1)(A) gives alternative routes for finalizing a conviction: either direct review is completed or the time to pursue direct review expires).

> Although federal, not state, law determines when a judgment is final for federal habeas purposes, a necessary part of the finality inquiry is determining whether the petitioner is still able to seek further direct review.     *See Foreman*, 383 F.3d at 338–39.     As a result, this court looks to state law in determining how long a prisoner has to file a direct appeal.     *See Causey v. Cain*, 450 F.3d 601, 606 (5th Cir. 2006); *Roberts*, 319 F.3d at 693.

*Butler v. Cain*, 533 F.3d 314, 317 (5th Cir. 2008).

As previously noted, Culverson's state criminal judgment of conviction became final for AEDPA purposes on August 7, 2003, when his time expired for seeking further direct review by writ of certiorari with the United States Supreme Court.     The one-year limitations period would have expired August 9, 2004.[40]     However, Culverson did not file the instant federal *habeas* petition with this Court until August 10, 2017.     Thus, his application must be dismissed as untimely unless the deadline was extended through tolling.

A.  Statutory Tolling

The Court finds no basis for statutory tolling in this case.     Regarding the statute of limitations, the AEDPA expressly provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."     28 U.S.C. § 2244(d)(2).

However, as the state-court record shows, Culverson had no such applications pending before the state courts during the applicable one-year period.     The one-year federal limitations period continued to run uninterrupted and expired on August 9, 2004.

---

[40]   The final day of the one-year period fell on Saturday, August 7, 2004.   Therefore, Culverson had until Monday, August 9, 2004 in which to file his federal application.   *See* Fed. R. Civ. P. 6(a)(1)(C) (when computing time, "include the last day of the period, but if the last day is a Saturday … the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday").

All three of Culverson's post-conviction applications were filed with the state district court after the expiration of the one-year time limitation.    Those applications were filed on February 23, 2005, March 5, 2014, and July 7, 2015, nearly 6 months, 10 years, and 11 years, respectively, after the one-year federal limitations period had already expired, and therefore could not possibly afford him any tolling benefit.    *See Madden v. Thaler*, 521 F. App'x 316, 320 (5th Cir. 2013); *Scott v. Johnson*, 227 F.3d 260, 263 (5th Cir. 2000); *Magee v. Cain*, Civ. Action No. 99–3867, 2000 WL 1023423, at *4, *aff'd*, 253 F.3d 702 (5th Cir. 2001) (citing *Williams v. Cain*, Civ. Action No. 00–536, 2000 WL 863132, at *2 (E.D. La. June 27, 2000)). Simply put, once the federal limitations period expired, "[t]here was nothing to toll." *Butler*, 533 F.3d at 318.

Culverson's July 7, 2015 application for post-conviction relief did not toll the federal limitations period for an additional reason.    It was ultimately found to be untimely under La. Code Crim. P. art. 930.8 by the Louisiana Supreme Court.    As the United States Supreme Court has expressly held, when a state post-conviction filing is rejected by the state courts as untimely, it cannot be considered "properly filed" within the meaning of § 2244(d)(2) and therefore does not toll the limitations period.    *Pace v. DiGuglielmo*, 544 U.S. 408, 410 (2005).    When a post-conviction filing is untimely under state law, "that is the end of the matter for purposes of § 2244(d)(2)."    *Id*. at 414 (quotation marks and brackets omitted). Because Culverson had no state applications pending at any time during the one-year limitations period, he clearly is not entitled to any tolling credit pursuant to § 2244(d)(2).

None of Culverson's motions or writ applications requesting documents were filed during the relevant one-year period.    Regardless, applications seeking documents are not considered "application[s] for State post-conviction or other collateral review" for tolling

purposes because they are preliminary in nature and do not directly call into question the validity of a petitioner's conviction or sentence. *Higginbotham v. Tanner*, Civ. Action No. 10–1130, 2011 WL 3268128, at *1 (E.D. La. July 29, 2011); *Parker v. Cain*, Civ. Action No. 02–0250, 2002 WL 922383, at *2 n. 22 (E.D. La. May 1, 2002), *certificate of appealability denied*, No. 03–30107 (5th Cir. June 23, 2003); *Boyd v. Ward*, Civ. Action No. 01–493, 2001 WL 533221, at *4 (E.D. La. May 15, 2001), *certificate of appealability denied*, No. 01–30651 (5th Cir. Aug. 22, 2001). Thus, those motions would not have provided him with any tolling benefit even had they been filed within the one-year period.

Culverson contends that he is entitled to a delayed commencement under 2244(d)(1)(D). For the reasons that follow, Culverson has failed to demonstrate that the subsection is the appropriate statutory trigger for the federal limitations period.

Under 28 U.S.C. § 2244(d)(1)(D), the commencement of the federal limitations period is delayed if a petitioner's claim is based on a factual predicate that could not have been discovered earlier through the exercise of due diligence. The one-year limitations period begins to accrue "when the factual predicate could have been discovered through the exercise of due diligence," not when it was actually discovered by a petitioner. 28 U.S.C. § 2244(d)(1)(D); *see Manning v. Epps*, 688 F.3d 177, 189-90 (5th Cir. 2012) (finding argument that § 2244(d)(1)(D) runs from actual discovery of claim is an "untenable theory."); *Owens v. Boyd*, 235 F.3d 356, 359 (7th Cir. 2000) ("... the time commences when the factual predicate 'could have been discovered through the exercise of due diligence', not when it was actually discovered by a given prisoner ... [and] ... not when the prisoner recognizes their legal significance."). The United States Fifth Circuit has held "that this means the date a petitioner is on notice of the facts which would support a claim, not the date on which the

petitioner has in his possession evidence to support his claim." *In re Young*, 789 F.3d 518, 528 (5th Cir. 2015) (citing *Flanagan v. Johnson*, 154 F.3d 196, 199 (5th Cir. 1998)); *see also Hunter v. Cain*, 478 F. App'x 852 (5th Cir. 2012) (citing *Starns v. Andrews*, 524 F.3d 612, 620–21 & n. 5 (5th Cir. 2008) (holding that the relevant date under § 2244(d)(1)(D) is the date that the *habeas* petitioner or his criminal attorney received the information in question)).

Culverson appears to contend that the factual basis for his claims was unknown to him until he received an affidavit from Dunbar signed November 26, 2014. Therefore, the "factual predicate" of petitioner's claims is that Dunbar purportedly lied during his trial testimony because he was threatened. Notably, petitioner's limitations period would run not from the date on which Dunbar signed the affidavit or the date on which petitioner in fact obtained the affidavit, but rather from the date on which petitioner could have discovered those lies through the exercise of due diligence.

Initially, the record reflects that Culverson was aware at the time of his trial that Dunbar had made claims that he had been threatened. Prior to trial, Culverson's attorney, John Venezia, interviewed Dunbar and, at that time, Culverson told Venezia that he had lied to police because they had threatened him.[41] At trial, Venezia cross-examined Dunbar about his previous statement.[42] Dunbar admitted he had told Venezia that Culverson never talked about a robbery and never spoke about or asked for a gun and that he had lied to police because they harassed him and told him that he would be thrown in jail on a made up

---

[41] State Rec., Vol. 3 of 20, Trial Transcript, pp. 229-230, 11/3/98; State Rec., Vol. 4 of 20, Trial Transcript (con't), pp. 235-241, 11/3/98.

[42] State Rec., Vol. 4 of 20, Trial Transcript (con't), pp. 235, 241-245, 11/3/98.

charge.[43]    Dunbar testified that Detective Cunninghan "harassed him" by "coming around too much and looking at, watching our houses, messing with us."[44]    However, at trial, Dunbar claimed that he had lied to Venezia.[45]

Further, Culverson acknowledged in his 2005 application for post-conviction relief that Dunbar claimed that Detective Cunningham had threatened him.[46]    Culverson claimed at that time that Dunbar lied because "Detective Cunningham had threatened Dunbar if he didn't.    These threats he has testified to on the stand, however, Dunbar gave three different statements to police of which he stated on the stand that Det. Cunningham forced him to give on three different occasions."[47]

Culverson stated in his letter dated March 5, 2014, which was construed as a post-conviction application, that he had proof that both Dunbar and Robinson were "blackmailed & threatened with excessive jail time by prosecutor Tommy Block & Detective Michael Cunningham of the Kenner Police Dept. to implicate me in this case.    Both state witnesses voluntarily came forward in 06 recanting their statements against me by signing some sworn affidavits before an officer at a notary republic [sic]."[48]    He further argued that "Had Mr. Venecia challenged these 2 state witnesses past criminal histories & argued their true motives for fabricating their statements & implicating me in this case it's highly probable my

---

[43]    *Id.*, at pp. 235, 241-242, 244-245.

[44]    *Id.*, at p. 244.

[45]    *Id.*, at pp. 246; State Rec., Vol. 3 of 20, Trial Transcript, p. 230, 11/3/98.

[46]    State Rec., Vol. 14 of 15, Application for Post-Conviction Relief, p. 11, 2/23/05.

[47]    *Id.*

[48]    State Rec., Vol. 8 of 20, Letter, p. 2, 3/10/14 (dated 3/5/14).

lawyer would've brought out all the illegal 'under the table' coercion & deals made between prosecutor Tommy Block and Det. Michael Cunningham & these 2 state witnesses at trial."[49]

The record establishes that, nearly 17 years prior to his filing his third application for post-conviction relief, Culverson was aware of Dunbar's claims that he had been threatened by Detective Cunningham if he didn't testify against Culverson.   Dunbar apparently first recanted his trial testimony by affidavit in 2006, nine years prior to the 2015 post-conviction application.   While it is unclear when Culverson actually became aware that that Dunbar had signed an affidavit in 2006 recanting his testimony, he has not demonstrated that he could not have discovered the information with the exercise of due diligence.

In any event, it is clear that by March 5, 2014, Culverson was aware that Dunbar had recanted his trial testimony and claimed that the prosecution had also threatened him with excessive jail time if he did not testify against Culverson.   On that date, Culverson claimed that he had "proof" supporting his claim.[50]   Even if the Court were to use March 5, 2014 as the date "when the factual predicate could have been discovered through the exercise of due diligence," petitioner's petition would still be untimely.   He waited 489 days until filing his July 7, 2015 application for post-conviction relief claiming prosecutorial misconduct, at which point the federal limitations period had run.   After the Louisiana state courts had completed review of his third application for post-conviction relief, he then waited another 108 days, until August 10, 2017, to file his federal application in this Court.   Thus, even if Subsection D were applicable, his petition would be untimely.

---

[49]   *Id.*, at p. 5.

[50]   *Id.*, at p. 2.

B.  Equitable Tolling

The Court recognizes that the AEDPA's statute of limitations is subject to equitable tolling.    *Holland v. Florida*, 130 S. Ct. 2549, 2560 (2010).    However, "a petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing."    *Id.* at 2562 (internal quotation marks omitted); *see also Davis v. Johnson*, 158 F.3d 806, 811 (5th Cir. 1998) (holding that the AEDPA's statute of limitations can be equitably tolled "in rare and exceptional circumstances").    A petitioner bears the burden of proof to establish entitlement to equitable tolling.    *Alexander v. Cockrell*, 294 F.3d 626, 629 (5th Cir. 2002).

In this case, the record shows an inexplicable lack of diligence on Culverson's part. While Culverson claims Dunbar signed his affidavit on November 26, 2014, he previously admitted that Dunbar signed an affidavit in 2006 recanting his testimony.    Culverson offers no excuse for his failure to get a copy of that affidavit or obtain another one.    In March 2014, petitioner alleged he had proof that the prosecution had threatened Dunbar with excessive jail time if he refused to testify against petitioner.    Yet petitioner offers no reason for his failure to file an application for post-conviction relief raising a claim of prosecutorial misconduct based on Dunbar's recantation of his trial testimony earlier.    Culverson has not established that an extraordinary circumstance existed or that he pursued his rights diligently.    It is well-settled that mistake, ignorance of the law, and a prisoner's *pro se* status do not suffice to justify equitable tolling.    *Johnson v. Quarterman*, 483 F.3d 278, 286 (5th Cir. 2007); *Cousin v. Lensing*, 310 F.3d 843, 849 (5th Cir. 2002); *Fierro v. Cockrell*, 294 F.3d

674, 682 (5th Cir. 2002); *Felder v. Johnson*, 204 F.3d 168, 171 (5th Cir. 2000); *see also Tate v. Parker*, 439 F. App'x 375 (5th Cir. 2011) ("The alleged extraordinary circumstances endured by Tate, such as ignorance of the law, lack of knowledge of filing deadlines, a claim of actual innocence, temporary denial of access to research materials or the law library, and inadequacies in the prison law library, are not sufficient to warrant equitable tolling"); *Mathis v. Thaler*, 616 F.3d 461, 474 (5th Cir. 2010) ([E]quitable tolling "is not intended for those who sleep on their rights").    Accordingly, the Court finds that Culverson is not entitled to equitable tolling.

> C.    Actual Innocence

Finally, Culverson appears to claim that the limitations period should be tolled because he is actually innocent of the crime for which he was convicted.    In *McQuiggin v. Perkins*, the United States Supreme Court held that "actual innocence, if proved, serves as a gateway through which a petitioner may pass ... [to excuse] the expiration of the statute of limitations."    *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013).    The Supreme Court has cautioned, however, that "tenable actual-innocence gateway pleas are rare[.]"    *Id.*    To succeed on this claim, a petitioner must present a credible claim of actual innocence based on "new reliable evidence ... that was not presented at trial," and he "must show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt" in light of that new evidence of his factual innocence.    *Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995).    Because actual innocence provides an exception to the statute of limitations rather than a basis for equitable tolling, a petitioner who can make a showing of actual innocence need not demonstrate reasonable diligence in bringing his claim, though a court may consider the timing of the claim in determining the credibility of the evidence of

actual innocence.    *McQuiggin*, 569 at 400.

In evaluating the reliability of the new evidence, the court may "consider how the timing of the submission and the likely credibility of the affiants."    *Schlup*, 513 U.S. at 331–32.    After considering all the evidence, the habeas court makes a " 'probabilistic determination about what reasonable, properly instructed jurors would do.' "    *House v. Bell*, 547 U.S. 518, 538 (2006) (quoting *Schlup*, 513 U.S. at 329).

As "new" evidence in support of his actual innocence claim, he points to an affidavit executed by Dunbar on November 26, 2014.    In the affidavit, Dunbar states as follows:

> In the criminal murder charged case of Mr. Houston Jackson, I made statements upon arrest and was told by a State Assistant Prosecutor what to say in the statement or, harm would be forth to my family and me.    In this statement of my own free will without threats, pressure, duress, intimidation, manipulation, force, etc. I was told what to say in the statement which was a lie and fabricated.    The Prosecutor in mention showed me a map and gun because I was on probation, and told me to say yes to the gun and map or I will go to prison for the rest of my live with them.    The Prosecutor then ask "Isn't this the map and gun used?"    I lied and said "yes".    However, I lied because I did not want them to violate my probation and/or bring my family-to jail for nothing.    The records will reflect that I was already on probation when the offense of Mr. Jackson occurred.    The gist of this matter in summation is: I was threatened to say "yes" to a map and gun that I knew nothing of.    I knew nothing of the case of Mr. Houston Jackson, nor anything about his case. Anything outside this statement is falsely placed into this case because I didn't have any knowledge of anything that happened in this case, and only through fear and intimidation did I say "yes" to a map and gun which I actually didn't have no knowledge of, or actually never seen before.

Culverson does not meet the rigorous burden of proof imposed under the actual-innocence exception based on the foregoing newly proffered evidence.

Dunbar's affidavit is not *reliable* new evidence establishing Culverson's innocence. Notably, Dunbar attempts to recant testimony not actually given by him at trial.    While Dunbar states in his affidavit that he "knew nothing of the case of Mr. Houston Jackson," his testimony did not implicate Jackson.    Although he claims that he answered affirmatively

when the prosecutor asked him, "Isn't this the map and gun used?", no such question was ever asked.    In fact, no witness ever identified a gun and there is no evidence that a gun or a map were ever found.    Furthermore, at no time did Dunbar provide any testimony about a map.    Rather, Travis Robinson was the witness who testified that he gave several statements to police and the prosecutors that the defendants had mapped out the robbery and that he saw co-defendant Samuel Kelly with a map of Chili's.[51]

To the extent that Dunbar's affidavit can be read to generally claim that he knew nothing of the robbery and murder, including Culverson's involvement, his claims directly contradict his statement made to police, his grand jury testimony and his testimony at trial. New facts presented by a recanting affidavit, especially those brought years later, are subject to extreme suspicion.    *Spence v. Johnson*, 80 F.3d 989, 1003 (5th Cir. 1996); *see Komolafe v. Quarterman*, 246 F. App'x 270, 272–273 (5th Cir. 2007).    In this case, such suspicion is particularly justified for several reasons.

First, Dunbar's affidavit was not executed until November 26, 2014, more than 16 years after petitioner's conviction.    Such a long delay casts doubt on the validity of a recantation.    *See*, *e.g.*, *Olson v. United States*, 989 F.2d 229, 232 (7th Cir. 1993) (finding recantation that occurred more than four years after trial to be "dubious"); *see also Strayhorn v. Booker*, 718 F. Supp. 2d 846, 874 (E.D. Mich. 2010) (noting that "[l]ong-delayed affidavits" are "treated with a fair degree of skepticism").

Second, no evidence has been presented that corroborates Dunbar's assertion that the prosecution and police officers coerced him into implicating petitioner and there is no

---

[51]    State Rec., Vol. 4 of 20, Trial Transcript (con't), pp. 124-125, 159, 169, 208, 11/3/98.

other evidence of petitioner's purported innocence that could lend a degree of credence to this inherently suspect, long-delayed recantation.    *See*, *e.g.*, *Teagle v. Diguglielmo*, 336 F. App'x 209, 213 (3rd Cir. 2009) (recantation was suspicious, untrustworthy, and "did not, in the absence of additional corroborating evidence or circumstance, meet the standard of reliability contemplated by *Schlup*"); *Allen v. Woodford*, 395 F.3d 979, 994 (9th Cir. 2005) (uncorroborated recantation is "even more unreliable" where original account was consistent with other evidence and recantation was not).

Third, Dunbar and petitioner have been friends (or at least acquaintances) since before the time of the crime.    Dunbar's preexisting relationship with petitioner renders his affidavit inherently suspect.    *See*, *e.g.*, *Milton v. Secretary, Department of Corrections*, 347 Fed. App'x 528, 531 (11th Cir. 2009) (finding the reliability of petitioner's affidavits suspect because they were executed by friends or fellow inmates).    Fourth, Dunbar is a convicted felon and an admitted drug user[52], which further calls his credibility into question.

Finally, Dunbar's inherently unreliable affidavit is not sufficient, when considered in light of all of the evidence presented at trial, to show that it is more likely than not that no reasonable juror would have convicted Culverson.    The record shows that Culverson was not convicted solely upon Dunbar's testimony at trial.    The record facts as succinctly summarized by the Louisiana Fifth Circuit on direct appeal established the following:

> Ms. Jennifer Luttrell was the manager of Chili's restaurant on West Esplanade Avenue in Kenner, Louisiana, when she was shot and killed in the early morning hours of December 21, 1997.    Ms. Luttrell had worked the evening shift at the restaurant, which was from 3:30 p.m. until closing. Alarm records indicate that Ms. Luttrell closed the restaurant and set the alarm at 1:54 a.m.
> Between 1:54 a.m. and 1:55 a.m., the alarm monitoring company,

---

[52]  State Rec., Vol. 4 of 20, Trial Transcript (con't), pp. 245, 11/3/98; Trial Transcript, p. 26, 11/4/98.

Honeywell, received three alarms.    Mary Brown, the team leader for the data integrity division of Honeywell, testified that the first alarm was set off by the infrared motion detector, the second alarm was set off by an interior door and the third alarm was tripped by an outside door.    Ms. Brown stated that all three alarms were restored, meaning that whatever caused the alarms to go off went back to a normal condition, such as when an open door is closed.

The cleaning crew, Frank Kerner and Bonnie Kerner, arrived at Chili's between 2:15-2:20 a.m. on December 21, 1997.    Kerner testified that upon arrival he noticed Ms. Luttrell's car parked at an unusual angle in the parking lot.    As he approached the door of the restaurant, he saw papers scattered on the floor inside and knew something was wrong.

Once inside, he found Ms. Luttrell on the floor bleeding but still alive. Despite medical attention, Ms. Luttrell died of a gunshot wound to the back of her head.

Detective Chad Jacquet of the Kenner Police Department was the first officer on the scene, arriving at approximately 2:30 a.m.    He called for an ambulance and secured the area. Jacquet did not see any signs of forced entry into the restaurant. He noted that Ms. Luttrell was still wearing her jewelry consisting of her wedding ring, earrings and a gold chain.    Her purse was on the serving area and her keys were next to her on the floor.    No money was missing from the restaurant safe.

Detective Michael Cunningham of the Kenner force arrived at 3:30 a.m. and was primarily responsible for the subsequent investigation, during which all employees of Chili's were interviewed.    Culverson, a cook at the restaurant, had worked a double shift on December 20th, the second shift ending at 10:52 p.m. He became a suspect when the statement he gave Cunningham on December 21st conflicted with information contained in the managers' red book.    The red book was used by managers to communicate with each other regarding activities or incidents which occur during each shift. Entries are made only by the managers.

Culverson told Cunningham that he did not have any disagreement with Ms. Luttrell during his two shifts on December 20th.    However, an entry Ms. Luttrell made in the managers' red book indicated that she had problems with Culverson and another employee during the evening shift.

Over the next three months, Cunningham continued to investigate the murder.    He learned that Culverson and Kelly had planned to rob the restaurant and that Jackson was involved in the plan.    He obtained information that they intended to rob the restaurant by holding a gun to the manager's head and forcing her to open the safe.    On April 3, 1998, Cunningham obtained arrest warrants for all three defendants.

*** 

At trial, Detective Cunningham, while his investigation was in progress, testified that Chili's and Crime Stoppers offered a $12,000.00 reward for information regarding the murder.    Posters were "passed out" in various

Kenner neighborhoods.

On March 16, 1998, Cunningham took a statement from Robinson, who was then employed as a security guard at a Benson automobile dealership. Robinson said that "about two weeks" before the Chili's murder he was at Culverson's house and overheard a conversation between Culverson, whom Robinson called "Bo," Kelly and another man, Kelly's cousin, name unknown to Robinson.

From the statement:

Q: So how did the conversation begin?

A: Well I walk in the apartment and Bo, Sam, and Sam's cousin were talking and I hear Bo say something about 10 G's.

Q: What do you mean by 10 G's?

A: Ten thousand dollars.

Q: Then what happened?

A: Bo says about the 10 G's and I asked him what about 10 G's.    Bo said where he works at they got a safe with a lot of money in it and there's either a lady in there by herself in the morning early or there only be one person in there with her.    Bo said it would be an easy lick. Bo said he knows that about the lady because he used to work that shift. Then Bo said if you put her at gunpoint she's going to open the safe. Then Sam said that's going to be an easy lick in and out.

Q: When you say Lick what do you mean?

A: Quick jack a robbery.

Q: So Bo said that there is a lot of money in the safe and that a lady would be in there by herself?

A: Yes.

Q: And he said he knows this because he used to work that shift?

A: Yes.

Q: And Bo said if you put her at gunpoint she would open the safe?

A: Yeah.

Q: Sam was the one who said that it would be an easy Lick in and out?

A: Sam said a walk in and walk out.

Q: Is there anything else you know about the murder?

A: About two days after they were talking about the Chili's Lick we was standing outside of Bo's apartment and they were talking about robbing some people in LaPlace.

Q: Who was with you this time?

A: Me, Bo, Sam, and Derrick Dunbar.

Q: What was said this time?

A: Sam and Bo were talking about robbing some people in LaPlace and Sam said he had Chili's all mapped out. Like he mapped out the setup.

Q: Anything else you are aware of?

A: About a day after the second time talking Derrick Dunbar told me he saw the map Sam was talking about.

Q: How did the conversation come about Chili's when you were talking to Derrick Dunbar?

A: I asked Derrick if he thought they were serious about the Chili's lick and Derrick told me they were because he said Sam showed him the map.

Q: Is there anything else you are aware of about the murder?

A: Well the day after the murder I was picking up Donald Collins and I was talking to him and I told him I saw about the Chili's murder on the news. I told Donald I thought Sam and Bo did it and Donald told me that Sam and Houston came to his house last night looking for a gun.

Q: When you picked Donald Collins up the next day where were the two of you going?

A: We were going to church.    Donald is on house arrest and the only time he can leave house is to go to church.

Q: And Donald told you that Sam and Houston came to his house to get a gun?

A: Yeah.

Q: Did he say if he gave a gun to Sam and Houston?

A: He said he didn't have one to give them.

Q: Why would they go to Donald to get a gun?

A: Because he used to always carry one.

Q: Do you know where Donald lives?

A: On Miami place in University City.

Q: What's Donald's last name?

A: Collins.

Q: Is there anything else you are aware of that might be related to the Chili's murder?

A: About two weeks after the murder I saw Sam coming down 31st Street and I was talking to him.    He said he was going to see Bo. That's the last time I saw him.

**END OF STATEMENT**

Cunningham said that neither in his initial conversation with Robinson nor at the time the statement was given did Robinson ask for or even mention any reward money.

On August 24, 1998, Robinson spoke with an Assistant District Attorney and told him that the earlier statement to Cunningham was untrue. Then, the next day on August 25th, Robinson went to the Criminal Investigation Bureau and gave another statement in which he said that the March 16, 1998 statement was the truth.    Robinson said that what he had said the previous day was not true and that he had made it because "I was scared...of someone taking my life."    Then, on August 25, 1998, Robinson again related all of the events and things he had told Cunningham on March 16, 1998, adding that Tanya Bailey, Culverson's girlfriend, in addition to Culverson's mother, had advised him to change his story implicating Culverson and the others.    Tanya said, according to Robinson, "...just tell them you went in there to get the money and we'll beat the case."

The day following Robinson's March 16, 1998 statement, Cunningham testified that he contacted Derrick Dunbar, who was among the state's

witnesses who testified at trial.    Dunbar said that he had known Culverson for "about a year" and Kelly for five years.    Dunbar said he was scared to go to court and testify; nonetheless, he said that about a week or two before the Chili's murder he in fact was at Culverson's house and that he did overhear the very same conversation described by Robinson in his March 16, 1998 statement. Dunbar testified about how Culverson and Kelly said they would carry out the Chili's robbery by "putting the gun to her head" and forcing the manager "to do what they wanted her to do."    Culverson said he had been working at Chili's for two weeks, "checking it out to rob."

Dunbar said that "maybe a week before the robbery," Culverson and Kelly asked him for a pistol, which Dunbar did not have.

At "about 12 o'clock to one o'clock" on the night of the murder, Dunbar said he was in a four-door red automobile with Culverson and Kelly and heard them talking about robbing Chili's.    Culverson, according to Dunbar's testimony, said he couldn't do it because somebody might recognize him. Kelly responded by saying he "could get somebody else."    The car, Dunbar said, was Kelly's.

Dunbar said he "got right back out" of the car and left, adding, "I didn't think they were going" to rob Chili's.    In any event, Dunbar said, "I didn't want to have anything to do with it."

The next day, Dunbar stated, Culverson asked him if he had "seen the news" about the Chili's murder.    Dunbar said he asked Culverson, "Did he do it?"    Culverson "nodded no and he smiled."

Several weeks later, Dunbar said he spoke with Kelly, who had been picked up for questioning.    Kelly, according to Dunbar, asked who "was telling on me."    Dunbar said Kelly had some bullets in his hand and he "throwed them in the tree."    Kelly told Dunbar he (Kelly) would find out who was telling on him.

Right before the trial, Dunbar testified that Culverson's mother "came to my house one night when I was asleep" and asked him to tell the jury that his story was not true, that he had made up the story for the reward money.

Under cross-examination, Dunbar admitted that he had been contacted by Culverson's attorney and that he had given a statement saying that Culverson had never talked about or planned any robbery and that what he had told the police was not true.    Dunbar, however, said at trial that what he had told the defense attorney was not true.    Earlier, under direct, Dunbar had said that he told Culverson's attorney "another story" because he (Dunbar) didn't know what to do and that he (Dunbar) was trying to get rid of him.

Standing alone, Dunbar's testimony was serious proof of the guilt of the three defendants.

During his investigation, Detective Cunningham also spoke with and obtained statements from Donald Collins on March 17, 18 and 26, 1998.    In the first statement, Collins said that on the night of the Chili's murder, Kelly's cousin came to his house looking for a gun.    Kelly's cousin said, according to Collins, that Kelly and Jackson were in the parked vehicle in front of the house,

that they had a robbery planned and that they had two guns but needed a third.

Collins said on March 17th that he did not see Kelly and Houston, but in the March 18, 1998 statement he said that he had actually seen Jackson, in the front seat of Jackson's blue Taurus station wagon, and Kelly in the passenger seat. The station wagon was parked on the curb, in front of Collins' house.

Kelly's cousin, Collins said, asked him to go on the "lick" (robbery) with them and that "they were going to get no less than 40 G's."

In the March 26, 1998 statement, Collins said:

> "When I told you that Houston and Sam (Kelly) were in the car and that only Sam's cousin came to my door well really all three of them came to my door.
> …
> "Sam and his cousin knocked on my door. Sam was asking me for a gun when Houston walked up to my door. Sam said that they had a Lick set on a white lady and they were going to get $40,000.00. Sam said if I get them a gun he would break me a little something. I told them I was under house arrest and I didn't have a gun. Sam asked if I wanted to go and said that I could go anywhere with the money. I told them I didn't have gun and I could not go. That's when my girlfriend came outside and told me to go inside.
> …
> "They said they already had two guns and needed a third."

This request was made, Collins said, between 8 and 10 p.m. on the night of the murder at Chili's.

Apparently Kelly did most of the talking to Collins. Jackson was present, however, and according to Collins, "he (Jackson) brought them to my house in his car and he heard Sam talking about it…"

At trial, both Robinson and Collins repudiated their respective statements incriminating Culverson, Kelly and Jackson. Robinson testified that he had lied to Detective Cunningham on March 16, 1998 because he wanted the reward money and that he had lied to the assistant district attorney on August 25, 1998 because there were criminal charges pending against him (Robinson) and that he was afraid the assistant district attorney was going to have him jailed for a year until his trial came up. Collins testified that he had lied to Cunningham because the detective had threatened to bring criminal charges against him.

Collins testified that Jackson had not brought anyone to his house asking for a pistol. Shakeitha Cage, Collins' girlfriend who was with Collins in his house the night of the murder, said that Collins had in fact spoken with someone, although she didn't see that person, and that Collins had told her: "They asked me did I have a gun."

Later, Cage said, Collins told her "Houston and them" had come for the gun.

Cunningham testified that Robinson and Collins had given statements voluntarily and that no pressure or threats were involved....[53]

In rejecting Culverson's and his co-defendants' direct appeal claim that the evidence was insufficient to support their convictions, the court of appeal reasoned:

The constitutional standard for testing the sufficiency of evidence requires that the evidence, direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt, in accord with *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).   When a case is prosecuted on circumstantial evidence, every reasonable hypothesis of innocence must be excluded assuming every fact to be proved that the evidence tends to prove. *See* LSA-R.S. 15:438 and *State v. Mitchell*, 99-3342 (La. 10/17/00), 772 So. 2d 78.

The requirement of LSA-R.S. 15:438 does not establish a standard separate from the *Jackson* standard, but rather provides a helpful methodology for determining the existence of reasonable doubt.

When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience.   *See State v. Shapiro*, 431 So. 2d 372 (La.    1982).

Second degree murder, LSA-R.S. 14:30.1(A), is the killing of a human being when the offender (1) has specific intent to kill or to inflict great bodily harm or (2) is engaged in the perpetration or attempted perpetration of armed robbery (and other listed felonies) even though he has no intent to kill or to inflict great bodily harm.

The elements of the crime of conspiracy, LSA-R.S. 14:26, are (1) an agreement or combination of two or more persons for the specific purpose of committing a crime, and (2) an act done in furtherance of the object of the agreement or combination.

Armed robbery, LSA-R.S. 14:64, is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.

LSA-R.S. 14:24 defines a principal as one concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime.

The first element of conspiracy requires specific intent which is defined

---

[53] *State v. Jackson*, Nos. 00-KA-221 to 00-KA-223 (La. App. 5 Cir. 3/15/01), 783 So. 2d 482; State Rec., Vol. 7 of 20.

in LSA-R.S. 14:10 as that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. Intent may be inferred from the circumstances of the transaction and the actions of the defendant. The overt act required in the second element of conspiracy need not be unlawful. It may be any act, innocent or illegal, accompanying or following the agreement, which is done in furtherance of its object, reference *State v. Richards*, 426 So. 2d 1314 (La. 1982) and *State v. Mayeux*, 94-105 (La. App. 5 Cir. 6/28/94), 639 So. 2d 828. Proof of a conspiracy may be made by circumstantial evidence, as stated in *State v. Zeno*, 99-69 (La. App. 5 Cir. 8/31/99), 742 So. 2d 699.

The crucial, damaging evidence against the three defendants was circumstantial. There were no eye witnesses, no fingerprints. The murder weapon was never found.

***

The jury saw and heard Cunningham and all of the other witnesses. If jurors believed the testimony of Cunningham, Derrick Dunbar, Shakeitha Cage and other state witnesses and if the jury found that Robinson and Collins had told the truth when they initially implicated the three defendants in a criminal conspiracy to rob Chili's, then proof of guilt was established beyond a reasonable doubt. Because Robinson and Collins were impeached with their prior inconsistent statements, the jury was free to determine their credibility on the stand, and could accept or reject the retractions of their earlier statements. *See State v. Short*, 00-866 (La. App. 5 Cir. 10/19/00), 769 So. 2d 823, 828. It is not the function of an appellate court to reweigh the credibility of witnesses.[54]

Here, Dunbar's affidavit does not show that Culverson was factually innocent of second-degree murder. Dunbar's assertions establish only the existence of conflicting evidence and credibility issues. *Bosley v. Cain*, 409 F.3d 657, 665 (5th Cir. 2005). Even if the new evidence could have created a reasonable doubt in the minds of some jurors, this evidence does not satisfy the exacting standard for proving actual innocence for which a petitioner must demonstrate that it is more likely than not that *no* reasonable juror would have convicted him in light of the new evidence. *Schlup*, 513 U.S. at 327 (emphasis added).

---

[54] *State v. Jackson*, Nos. 00-KA-221 to 00-KA-223 (La. App. 5 Cir. 3/15/01), 783 So. 2d 482, 487-491; State Rec., Vol. 7 of 20.

In sum, the instant petition was filed 13 years after the federal limitations period expired. Culverson has not established any basis for statutory or equitable tolling nor has he established that the actual innocence exception applies. Therefore, his federal *habeas* corpus petition should be dismissed with prejudice as untimely.

## II.    Procedural Default

For the reasons previously discussed, the petition is time-barred. Alternatively, the Court addresses the State's assertion that petitioner's claim is procedurally defaulted. That assertion is correct.

Culverson raised his federal claim for relief in post-conviction applications in all three state courts. The district court denied the claim finding that there was no credibility in the affidavit presented and, as a result, petitioner failed to meet his burden of proof pursuant to La. Code Crim. P. art. 930.2. The Louisiana Fifth Circuit found that petitioner's application for post-conviction relief was timely filed but similarly concluded that he failed to carry his burden of proof. The Louisiana Supreme Court denied petitioner's application as untimely.

Generally, a federal court will not review a question of federal law decided by a state court if the decision of that state court rests on a state-law ground that is both independent of the merits of the federal claim and adequate to support that judgment. *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991); *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997), *cert. denied*, 523 U.S. 1125 (1998); *Amos v. Scott*, 61 F.3d 333, 338 (5th Cir. 1995) (citing *Harris v. Reed*, 489 U.S. 255, 260, 262 (1989)). The United States Fifth Circuit Court of Appeals has held:

> A claim that a state has withheld a federal right from a person in its custody may not be reviewed by a federal court if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis

for the court's decision.      To satisfy the "independent" and "adequate"
requirements, the dismissal must "clearly and expressly" indicate that it rests
on state grounds which bar relief, and the bar must be strictly or regularly
followed by state courts, and applied to the majority of similar claims.      This
rule applies to state court judgments on both substantive and procedural
grounds.

*Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001) (citations omitted ).      The last reasoned

state court ruling is used to make this determination.      *Ylst v. Nunnemaker*, 501 U.S. 797,

803–05, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

In the last reasoned state-court judgment, the Louisiana Supreme Court clearly and

expressly rejected petitioner's claim on state-law procedural grounds, finding the claim

untimely pursuant to Louisiana Code of Criminal Procedure article 930.8 and *State ex rel.*

*Glover v. State*, 93-2330 (La. 9/5/95), 660 So. 2d 1189.

Article 930.8 sets forth the limitations period for filing applications for post-

conviction relief, while the *Glover* decision held that an appellate court is not precluded from

denying relief pursuant to article 930.8 even if the lower court did not consider timeliness.

It is well-settled that article 930.8 qualifies as an independent and adequate state-law

procedural ground to support a procedural bar to review.      *Glover v. Cain*, 128 F.3d at 902;

*see also Morris v. Cain*, No. 06–30916, 2008 WL 3876479 (5th Cir. Aug. 20, 2008) (per

curiam); *Pineyro v. Cain*, 73 F. App'x 10, 11 (5th Cir. 2003).      The United States Fifth Circuit

Court of Appeals has held that denial of relief premised on the untimeliness of a claim under

article 930.8 "is sufficient to fulfill the independence requirement" of the procedural default

doctrine, and that article 930.8 is strictly and regularly followed and evenhandedly applied

by Louisiana courts to the vast majority of similar claims.      *Glover*, 128 F.3d at 902.

Because the last reasoned decision by the Louisiana Supreme Court rested expressly

upon an independent and adequate state rule of procedural default, this Court may not

review the instant claim unless petitioner demonstrates cause for the default and actual prejudice or a fundamental miscarriage of justice.

To establish cause for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded his efforts to comply with the state's procedural rule.    *Murray v. Carrier*, 477 U.S. 478, 488 (1986).    In this case, Culverson has not offered any cause for the default that would excuse the procedural bar imposed by the Louisiana courts.    Nor does the Court's review of the record support a finding that any factor external to the defense prevented Culverson from raising the claim in a procedurally proper manner.    In addition, neither *pro se* status nor ignorance of the law is sufficient cause to excuse a procedural default.    *See Saahir v. Collins*, 956 F.2d 115, 118 (5th Cir. 1992).    "The failure to show 'cause' is fatal to the invocation of the 'cause and prejudice' exception, without regard to whether 'prejudice' is shown."    *Hogue v. Johnson*, 131 F.3d 466, 497 (5th Cir. 1997) (citing *Engle v. Isaac*, 456 U.S. 107, 134 n. 43 (1982)).    Because Culverson failed to show an objective cause for his default, the Court need not determine if prejudice resulted.

Finally, because petitioner has not met the "cause and prejudice" test, this Court should consider his exhausted claim only if the application of the procedural bar would result in a "fundamental miscarriage of justice."    In order to establish that there would be a "fundamental miscarriage of justice," a petitioner must "make a persuasive showing that he is actually innocent of the charges against him.    Essentially, the petitioner must show that, as a factual matter, he did not commit the crime for which he was convicted."    *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001) (citations omitted).    For the reasons previously discussed, Culverson has not made any showing that he is actually innocent of the underlying

conviction.    Therefore, he has not established that any a miscarriage of justice would result from this Court's application of the procedural bar.    Accordingly, the claim is procedurally barred in this federal court.

Culverson has failed to overcome the procedural bar to his claim.    Consequently, the Court finds the claim is procedurally barred and, alternatively, should be dismissed with prejudice for that reason.

## **RECOMMENDATION**

**IT IS RECOMMENDED** that Culverson's application for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[55]

New Orleans, Louisiana, this ___7th___ day of _____May_____, 2018.

_____
**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

[55] *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.